**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Salvatore SARULLO and Garry M. Solomon, Defendants-Appellants.**

**Nos. 74–1273, 74–1274.**

United States Court of Appeals, Sixth Circuit.

Feb. 20, 1975.

Marvin C. Goff, Jr., Goff, Kizer & Cribbs, F. P. Cribbs, Jr., Phillip E. Kuhn, Memphis, Tenn., for defendants-appellants.

Thomas F. Turley, U. S. Atty., J. Richard Buchignani, W. Hickman Ewing, Jr., Memphis, Tenn., for plaintiff-appellee.

Before WEICK and MILLER, Circuit Judges, and O'SULLIVAN, Senior Circuit Judge.

WILLIAM E. MILLER, Circuit Judge.

The principal issue on this appeal is the applicability of collateral estoppel [1]

---

1. Although defendants in their brief frequently refer to double jeopardy, collateral estoppel and res judicata as synonymous terms, the principal thrust of their appellate position is

as a defense to charges of a conspiracy to misapply and actual misapplication of federally secured bank funds.

Defendant Garry M. Solomon was assistant cashier of the Memphis Bank and Trust Company. In this capacity one of his duties was to handle the operative features of a special bank account referred to variously as the collections-in-transit account or account A-71. This account was designed to accommodate only those bank customers approved for its benefits by higher bank authority to effect collection of various items, in many instances the purchase price of corporate stocks. For example, one James N. Reddoch, a Memphis stock broker, had been approved by the appropriate bank authorities to benefit from the account in making collections of the purchase price of stocks sold by him or his brokerage firm. Two procedures were employed to effectuate the collections. These procedures are described as "drafting out" and "drafting in." If Reddoch had sold stock to a purchaser in another area, Memphis Bank and Trust would advance to him funds out of account A-71 equal to the purchase price immediately upon receiving from him the stock certificates properly endorsed. The certificates would then be forwarded or drafted out to a correspondent bank, together with a collection letter, a copy of which would be retained by Memphis Bank and Trust for its record. Upon receiving collection, the funds would be redeposited in account A-71. For this service, Reddoch would be charged interest on the advance covering the period required for collection. The reverse procedure of drafting in was used infrequently by Reddoch when he was the purchaser of stock forwarded to Memphis Bank and Trust for collection. Upon receiving the certificates, the bank would not release them to Reddoch until it had collected the purchase price from him. These were approved procedures, involving no misapplication of the bank's funds and exposing it to a minimum risk of loss.

In contrast, soon after August 23, 1969, without the knowledge or approval of higher bank authority, Solomon and defendant, Salvatore Sarullo, who had not been approved by higher bank authority to have the benefit of the account, began using account A-71 to enable the latter to obtain capital to trade on the stock market, without paying interest on the funds advanced to him and without furnishing collateral. This was accomplished in some instances by drafting in for collection stocks purchased by Sarullo. When these stocks were received, Solomon would forward the purchase price by debiting account A-71. Simultaneously, he would release the stocks to Sarullo. Only after he had resold the stocks would Sarullo reimburse the bank. Solomon also frequently made the bank's funds available to Sarullo to purchase stock simply by debiting A-71 in the amounts advanced and crediting the same amounts to one of the two personal accounts maintained by Sarullo at the bank. By the use of numerous debit-credit memos, funds approximating $1,500,000.00 were transferred by Solomon from A-71 to Sarullo's personal checking accounts. These transactions resulted in a net loss to the bank of $286,000.00. For his part in the scheme, Solomon received monetary rewards evidenced by advances from Sarullo's personal account to Solomon's account.

The Solomon-Sarullo dealings led to the return of a ten-count indictment against them on July 12, 1971. (Cr.–71–154). The first count charged Sarullo and Solomon with engaging in a conspiracy, in violation of 18 U.S.C. Sec. 371, to misapply funds of a federally insured bank over a period of unknown duration but ending on December 3, 1973. Counts two through ten charged Solomon as principal and Sarullo as aider and abet-

most accurately described as being that the prosecution of this case is barred by collateral estoppel arising from defendants' prior acquittal in another case. As we find that collateral estoppel is not applicable, we have not found it necessary to discuss the principles of double jeopardy and res judicata.

tor with violating 18 U.S.C. Secs. 2 and 656 by willfully misapplying bank funds in specific instances. These are referred to as the substantive counts of the indictment as distinguished from the conspiracy count. Many of the same misapplications of funds on specific occasions are charged in count one of the indictment as overt acts in furtherance of the conspiracy. The first trial under this indictment resulted in a jury verdict of guilty under counts two through ten and a mistrial under the conspiracy charge of count one. Later the district court granted the motion of Solomon and Sarullo for a new trial based on newly discovered evidence.

Before the second trial of Solomon and Sarullo under indictment Cr.–71–154, another indictment was returned (Cr.–71–160) on July 17, 1971, against Solomon and Sarullo and John Gary Veazey and James Barham Lambert. Count one of this indictment charged these four defendants with conspiring to misapply funds of Memphis Bank and Trust Company in violation of 18 U.S.C. Sec. 371. Counts two through four charged Solomon as principal, and Sarullo, Veazey and Lambert as aiders and abettors, with violating 18 U.S.C. Secs. 2 and 656, by misapplying bank funds in specific transactions occurring prior to December 3, 1969. These specific misapplications in addition to being charged as substantive offenses are also charged as overt acts in furtherance of the conspiracy. In this case the court directed a verdict of not guilty on one of the substantive counts and the jury returned a verdict of acquittal on the remaining three counts, including the conspiracy charge of count one.

Defendants Solomon and Sarullo then filed a motion in Cr.–71–154 to dismiss the indictment on grounds of collateral estoppel, double jeopardy and res judicata based upon their acquittal on the conspiracy and substantive charges in Cr.–71–160. Another motion by defendants to restrict the evidence to be used in the re-trial of Cr.–71–154 was also filed. All

defense motions were overruled and Cr.–71–154 was brought on for re-trial, resulting in the defendants being found guilty on all ten counts and in their receiving sentences of thirty months' confinement. The present appeal ensued.

It is not disputed that in January 1969, Sarullo, Veazey and Lambert formed a partnership, under the name of Security Investors, to engage in the buying and selling of stock. As in the case of Sarullo individually, Solomon made large amounts of bank funds available to the firm to engage in stock trading without receiving interest or security and without approval by higher authority of Security Investors as a customer entitled to the use of account A-71. In these instances also the scheme was carried out through a misuse of account A–71 in a fashion comparable to its use by Sarullo. Funds in excess of $1,000,000.00 were wrongfully channeled by Solomon to the firm's account, finally causing a net loss to the bank of $21,000.

Because the Solomon-Sarullo transactions and the Solomon-Sarullo-Security Investors transactions, both keyed to account A-71 and to Solomon and Sarullo as the core figures, were practically identical in method and technique, defendants insist that their acquittal of the charges in Cr.–71–160 bars their prosecution on the charges in Cr.–71–154. To meet this argument, the government insists that two distinct conspiracies were in operation and that the issue of criminal intent on the part of Solomon and Sarullo was essentially different in the two cases. To buttress this argument, the government points to certain distinguishing features:

1. The conspiracy charged in Cr.–71–154 consisted of Solomon and Sarullo only, while the conspiracy charged in the later indictment was composed of four conspirators.

2. Only Sarullo and Solomon benefited from the Solomon-Sarullo transactions, while Veazey and Lambert not only received no benefit from these dealings but had no knowledge that they

were taking place. Indeed, the separate dealings of Sarullo with Solomon were in direct violation of his agreement with his partners when Security Investors was formed that he would not engage in stock trading individually but only through the partnership.

3. While a part of the evidence in the two cases from which criminal intent might be inferred was overlapping, the overlap was caused not by the government but by Veazey and Lambert in unnecessarily eliciting facts on cross-examination pertaining to the Solomon-Sarullo transactions.

4. The specific transfers or misapplications charged in the two indictments as overt acts or as substantive violations were altogether separate and distinct transactions. The parties were also essentially different in these transfers in that in the Cr.–71–154 transactions only Solomon and Sarullo were involved, while in the transactions described in Cr.–71–160, Solomon advanced bank funds to Security Investors, a partnership composed of Sarullo, Lambert and Veazey.

Defendants repeatedly state that the criminal intent of defendants Solomon and Sarullo was a fact essential to establish the offenses charged in both indictments. Since this issue, they argue, was actually adjudicated in the trial of Cr.–71–160 in favor of defendants, it cannot be relitigated in the later trial of Cr.–71–154. The argument necessarily presupposes that since defendants had no criminal intent in the Solomon-Sarullo-Security Investors dealings, they could not have had such intent in the Solomon-Sarullo transactions.

■ It is apparent to us that the basic fallacy in this argument is that it ignores the truism that "criminal intent," being a state of mind, may be determined only from the attendant facts and circumstances to which it bears a direct relationship. One may possess a criminal intent in one framework of facts but be perfectly innocent in another.

The Supreme Court in Ashe v. Swenson, 397 U.S. 436, 444, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970), clearly delineated the test to be followed to determine in criminal cases whether collateral estoppel is applicable to bar a subsequent prosecution.

The federal decisions have made clear that the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality. Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." The inquiry "must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings." Sealfon v. United States, 332 U.S. 575, 579 [68 S.Ct. 237, 240, 92 L.Ed. 180]. Any test more technically restrictive would, of course, simply amount to a rejection of the rule of collateral estoppel in criminal proceedings, at least in every case where the first judgment was based upon a general verdict of acquittal.

■ Our examination of the indictment, the evidence and the court's charge in Cr.–71–160, leads us to the determination that a rational jury could have grounded its verdict upon an issue other than that which the defendants seek to foreclose from consideration in the present case. The dealings and transactions constituting the basis for the prosecution of Cr.–71–160 are so essentially separate, disparate and distinct from those involved here, that it cannot reasonably be said that the jury's finding in the former case on the issue of criminal intent is conclusive of the issue of criminal intent on the facts of the present case. A comparison of the two proceedings demonstrates that a jury might fairly find that defendants Solo-

mon and Sarullo acted with criminal intent in their dealings with one another but without such criminal intent in the separate transactions in which the firm of Security Investors was involved, a firm composed of Veazey and Lambert in addition to Sarullo. In this connection the language of this Court in United States v. O'Dell, 462 F.2d 224, 226, n. 2, (1972), is apposite:

O'Dell was previously acquitted of charges that he joined in a conspiracy to deprive persons of their civil rights. Though involving the same time period and a similar extortion scheme the earlier charges (Indictment # 7167) differed substantially from the present ones in the identity of both O'Dell's alleged co-conspirators and the victims of the asserted plots.

O'Dell contends that the Government improperly separated one conspiracy into two to increase its chances of successful prosecution. Had he been able to establish that but a single overall conspiracy existed we would be compelled to uphold his former jeopardy claim. United States v. Cohen, 197 F.2d 26 (3rd Cir. 1952); United States v. Palermo, 410 F.2d 468 (7th Cir. 1969).

O'Dell had the burden of showing the unified nature of the conspiracy. Sanchez v. United States, 341 F.2d 225 (9th Cir. 1965), cert. denied 382 U.S. 856, 86 S.Ct. 109, 15 L.Ed.2d 94 (1965); Rothaus v. United States, 319 F.2d 528 (5th Cir. 1963). He has not met that burden.

The District Court held that the total dissimilarity of the alleged victims of the two plots alone required a finding that two conspiracies existed. While this view has support (see United States v. Brimsdon, 23 F.Supp. 510 [W.D.Mo.1938]) we are reluctant to base our entire decision on it, given the fact that the conspiracy may well have been aimed not at any specific individuals, but at a broad class of persons arguably composed of victims named in both indictments. We therefore rely also on the difference in the identity of the alleged conspirators and the difference in their official positions. While the group in # 7167 was primarily composed of state highway patrolmen, that named in the present indictment was composed entirely of local policemen. In the absence of any evidence that the two distinct groups worked together toward a common goal, rather than merely following parallel plans built around the central figures—O'Dell and Leatherwood—we do not find any reason to view the two plots as part of a single unified conspiracy.

In light of this holding with respect to the existence of two separate and distinct conspiracies and in the absence of any indication whatever that the overt acts involved in the two conspiracies were identical in time, place or participants, we also find O'Dell's claim of collateral estoppel without merit.

As we have pointed out, in the present case there is not only a difference in the identity of the alleged conspirators, but it affirmatively appears that the overt acts averred in the two indictments are separate and distinct and, as far as the records show, unrelated. There is nothing to establish that the two groups worked together toward a common goal despite the fact that the modi operandi in the two cases were practically the same, encompassing the use of account A-71, Solomon and Sarullo being the central or core figures in both instances.

We have examined the cases cited and relied upon by the defendants but we deem them to be distinguishable and not controlling here.

The defendants' other assignments advanced in this Court for reversal of their convictions have been carefully weighed and have been found to be without merit. These include the contentions that improper comment was made upon the defendant Sarullo's fifth amendment right not to take the witness stand in his own behalf, that the trial court improperly injected itself into the trial, that the trial court erred in refusing to dismiss

the indictment by reason of unreasonable pre-indictment delay, and finally that the trial court erred in allowing the prosecution to question defense witness Young regarding a statement he had taken from Solomon.

Affirmed.